**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION**

| | | |
|---|---|---|
| IN RE: | ) | CHAPTER 11 |
| | ) | |
| CIRCLE T PIPELINE, INC., | ) | Case No. 11-70556 |
| | ) | |
| Debtor. | ) | |

---

### MEMORANDUM OPINION

The Debtor, serving as debtor-in-possession in this case, filed its Application of the Debtor Pursuant to Section 327(a) of the Bankruptcy Code for Authorization to Employ Copeland & Bieger, P.C. as Attorneys for the Debtor (the "Application") on March 18, 2011. The United States Trustee filed its Objection to the Application (the "Objection") on April 1, 2011. After considering the Application and Objection, the evidence presented at the hearing on April 6, 2011, the schedules and other pleadings filed in the case, and the arguments in the memoranda subsequently filed by both parties, the Court will conditionally approve the Application and overrule the Objection.

### PARTIES' LEGAL CONTENTIONS

In the Objection, the United States Trustee points to a number of provisions in the original Attorney-Client Retainer Agreement (the "Original Agreement") entered into between the Debtor and Copeland & Bieger, P.C. (the "Firm") that it contends disqualify the Firm from serving as Debtor's counsel under 11 U.S.C. § 327. The first challenged provision is found in section four of the Original Agreement, which provides, in pertinent part:

> In order to engage the Firm to render the services contemplated by this Agreement, the Client has caused to be paid to the Firm a general retainer in the amount of $25,000, paid in advance of services to be rendered . . . . Client understands and agrees that this retainer is, and will be considered and treated by the Client and

the Firm as, the property of the Firm, not of the Client.  The Client
further understands that, the total retainer paid to the Firm constitutes
a general retainer in the nature of a preliminary, non-refundable
engagement fee paid in exchange for the Firm's agreement to
undertake the Client's representation and to forego other possible
conflicting representations.[1]

The United States Trustee contends that this provision constitutes a non-refundable, earned upon

receipt retainer that violates Rule 1.16(d) of the Virginia Rules of Professional Conduct.  It

argues that, by claiming an ownership interest in the unearned portion of the retainer, the Firm is

asserting ownership over property of the estate.  It further argues that the Firm therefore holds an

interest adverse to the estate and is disqualified from serving as Debtor's counsel under 11

U.S.C. § 327(a).

Next, the United States Trustee challenges section three of the Original

Agreement, which provides:  "Client authorizes the Firm to negotiate, settle, or compromise all

matters in the case as Client's attorney in fact.  Client agrees not to undertake such negotiations,

settlements, and compromises without availing himself of the legal consultation made available

to him under this Agreement."  The United States Trustee argues that this provision gives the

Firm the power to negotiate, settle, and compromise all disputes without Debtor's approval.  It

notes that, under 11 U.S.C. § 1107, the debtor-in-possession has most of the rights, powers, and

duties of a trustee and that, under 11 U.S.C. § 327(a), the debtor-in-possession may employ an

attorney "to represent or assist" the debtor-in-possession in carrying out its duties.  It may not,

---

[1] Although the Agreement, the Debtor's Statement of Financial Affairs, and the
Disclosure of Compensation of Attorney for Debtor (the "Rule 2016(b) Disclosure") correctly
state that the Debtor paid the Firm a retainer of $25,000, the Declaration of Robert T. Copeland,
which was filed along with the Application in accordance with Fed. R. Bankr. P. 2014, states
that the Firm received a retainer of $24,000.  This discrepancy may result from the fact that the
larger amount includes the $1,039 filing fee which was payable out of this amount.

2

the Objection contends, delegate its fiduciary duties to the Firm.  In addition, the Objection

argues that the challenged provision violates Rule 1.2 of the Virginia Rules of Professional

Conduct, which provides in pertinent part:  "A lawyer shall abide by a client's decision, after

consultation with the lawyer, whether to accept an offer of settlement of a matter."

Finally, the United States Trustee argues that the Original Agreement purports to

grant a lien to secure payment of future fees that is not available under Virginia law.  It points to

section four of the Original Agreement, which provides in part:

> Any fees and reimbursement of expenses allowed to the Firm
> by the Bankruptcy Court in excess of the general retainer (hereinafter
> referred to as "Client Indebtedness") shall be paid by the Client
> promptly within fifteen (15) days following entry of the order of the
> Court.  The Client's obligation to pay said Client Indebtedness shall
> be secured in accordance with the Code of Virginia.

The Objection points out that Va. Code Ann. § 54.1-3932(a) gives an attorney representing a

client with a cause of action sounding in tort, based upon a contract, or for annulment or divorce

a lien upon the cause of action for payment of his fee.  It argues that the Firm cannot secure fees

and expenses in excess of the retainer it received in this case.[2]

In response to the United States Trustee's arguments concerning the Original

Agreement, the Debtor states that it and the Firm entered into an Amended Attorney-Client

Retainer Agreement (the "Amended Agreement") that deletes the challenged provisions.  As a

---

[2] Although not mentioned by the United States Trustee, the Court notes that there are a
number of additional errors in the Original and Amended Agreements and in the documents filed
by the Firm on behalf of the Debtor in this case.  For instance, there is a missing period or other
punctuation in paragraph six of the Original and Amended Agreements that renders the meaning
of that provision ambiguous.  As an additional example, in the Statement of Financial Affairs,
the Debtor lists payments to Kenneth Anders and Bob Mullins as payments to creditors who are
insiders in item 3(c), yet states that there were no withdrawals or distributions given to an insider
in section 23.

result, the Debtor argues that the United States Trustee's contention about delegation of

fiduciary duties is "no longer operative."  The United States Trustee, on the other hand, contends

that the harm was done when the Firm presented the Original Agreement to the Debtor and the

Amended Agreement does nothing to change this fact.  However, the Debtor argues that the

United States Trustee can point to no real harm caused by the Original Agreement, so

disqualification of the Firm on that basis would be an unduly harsh penalty.

      The United States Trustee's other main contention in the Objection is that the

Firm is not a "disinterested person," as that term is defined in 11 U.S.C. § 101(14), so under 11

U.S.C. § 327, it cannot represent the Debtor.  Although ultimately abandoned by the United

States Trustee at the hearing, its first basis for this argument was that the Debtor paid part of the

retainer by endorsing to the Firm third party checks made payable to the Debtor and that were

therefore subject to the liens on the Debtor's cash collateral.  The Court agrees with the United

States Trustee's concession on that point.  Accordingly, it will not deal further with that issue

either factually or legally in this decision.  The main basis for the claim that the Firm is not

"disinterested," however, is the latter's prior representation of Larry Sturgill, an individual listed

on the Debtor's Schedule F as having two claims against the Debtor in the amounts of $1,284.84

and $60,612.32.[3]  The United States Trustee notes that, in the Declaration of Robert T. Copeland

attached to the Application (the "Declaration"), Mr. Copeland, a member of the Firm, discloses

---

[3] The Debtor's Statement of Financial Affairs filed on April 15, 2011, after the date of the
hearing on the contested employment application, indicates that Mr. Sturgill received a $10,000
payment from the Debtor on December 23, 2010.  It also indicates that Mr. Sturgill, a certified
public accountant, provided bookkeeping services to the Debtor since 2008, audited the books of
account and records of the Debtor since 2008, and is currently in possession of the books and
records of the Debtor.  Schedule H was also filed on the same date which listed Mr. Sturgill as a
co-debtor together with Mr. Anders on an indebtedness owing by the Debtor to BB&T.

4

that he provided advice to Mr. Sturgill about his guarantees of Debtor's debts and that

"[s]ervices to Mr. Sturgill ended on approximately February 25, 2011."  The Objection alleges

that Mr. Sturgill guaranteed about $1,000,000 in debt related to drilling equipment that the

Debtor intends to surrender, is a co-debtor on loans secured by two water trucks the Debtor

intends to use in the water hauling portion of its business, and owns a third water truck that he

leases to the Debtor.  The Objection states that the Firm did not fully disclose these connections

between Mr. Sturgill, the Firm, and the Debtor; the Firm is not disinterested because of the

connections; and the Firm's ability to represent the Debtor is limited because of its

representation of Mr. Sturgill.

In response to this argument, the Debtor first says that there are a number of

factual inaccuracies in the United States Trustee's argument and points out that Mr. Sturgill is

not the owner of a water truck leased to the Debtor but is instead the owner of a business entity

that leases the truck to the Debtor.[4]  The Debtor goes on to argue generally that the Firm is a

disinterested person as that term is defined in § 101(14), so the only way it can be disqualified is

if it holds an interest that is materially adverse to the estate.  The Debtor then argues that, to hold

an interest adverse to the estate, one must possess an economic interest that would lessen the

value of the estate or that would create either an actual or potential dispute in which the estate is

a rival claimant.  In addition, the Debtor argues that the United States Trustee's argument

ignores 11 U.S.C. § 327(c), which states that a professional is not disqualified solely because of

the person's employment by or representation of a creditor unless there is an actual conflict of

---

[4] However, according to List B, which was attached to the Debtor's Schedule B filed on
April 15, 2011, Mr. Sturgill's company, JMATT Properties, Inc., leases the Debtor seven
vehicles and nine other pieces of equipment and not just one water truck.

5

interest.   The Debtor argues that the Firm's representation would comply with Rule 1.9(a) of the

Virginia Rules of Professional Conduct, which governs conflicts of interest with former clients,

so there would be no actual conflict of interest in this case.  Specifically, the Debtor argues that

Mr. Copeland's representation of Mr. Sturgill ended with his consent on February 25, 2011, and

both Mr. Sturgill and the Debtor consented to the Firm representing the Debtor in this

bankruptcy case.  The Debtor also points out that prior to accepting employment by the Debtor

Mr. Copeland contacted the Office of the United States Trustee to determine if there would be an

objection to the Firm's representation of the Debtor by reason of his prior assistance to Mr.

Sturgill, that he had replied to questions raised by counsel for the United States Trustee as to

whether such individual had been an officer, director or shareholder of the Debtor, and that no

objection had been communicated to him prior to the filing of the case and the Application.

Finally, with regard to the disclosure of Mr. Sturgill's other connections with the Debtor, Mr.

Copeland testified at the hearing that he had no knowledge of them until after he filed the

Declaration and that he believes the disclosure was therefore proper.

         The United States Trustee asserts that there is a conflict of interest due to the

Firm's prior representation of Mr. Sturgill.  It further argues that any purported waiver of this

conflict would not be enough to comply with the provisions of § 327.  Even if waiver were

enough, the United States Trustee questions whether the purported waiver in this case was

effective.   It notes that informed consent is necessary for a waiver of the conflict, and informed

consent was not given because nothing indicates that Mr. Copeland informed Mr. Sturgill of the

possibility of his taking actions adverse to Mr. Sturgill's business interests while representing the

Debtor.  The Debtor, however, argues that it is only true that a waiver will not suffice for

6

purposes of § 327 when there is a continuing relationship between the professional seeking

employment and a creditor.  Where, as here, the relationship between the professional and the

creditor terminated prior to the representation of the Debtor, a waiver will be enough.  The

Debtor also disputes the United States Trustee's argument that Mr. Sturgill did not give his

informed consent by arguing that it can point to no evidence contradicting the evidence

presented at the hearing that Mr. Sturgill terminated the representation and consented to the

representation of the Debtor.

      The United States Trustee's last argument is that the Firm is not disinterested

because it is a creditor of the Debtor.  Specifically, it points out that, prior to the filing of the

petition, the Firm wrote a $3,000 check from its trust account, where the Debtor's retainer had

been deposited, and transferred it to the operating account to pay for the pre-petition work it had

done for the Debtor.  The United States Trustee argues that the pre-petition withdrawal from the

trust account was $116 less than the actual amount owed to the Firm for fees and costs.  In

addition, there was no evidence the check from the trust account was presented or that it cleared

prior to filing, so the Firm's claim for pre-petition fees is really $3,116.  Finally, the United

States Trustee says that the Firm is also a creditor because it advanced the $1,039 filing fee to

the Debtor by paying it with the Firm's credit card.

      The Debtor, on the other hand, argues that there was never any indication that the

$116 shortfall was ever billed or was due and owing.  It also argues that the Firm agreed to

waive any pre-petition debt and would repay the estate the $3,000 it received on the date the case

was filed if necessary.  It argues that the payment of the filing fee should not be considered to

give rise to a debtor-creditor relationship because the filing fee must be paid with a credit card

7

and there was therefore no way for the Firm to file the case without using its credit card.  It goes

on to state that if the Firm is to be disqualified because it used its credit card to pay the filing fee,

"then probably every Counsel in every case would be a 'creditor' at the time the case is filed."

## SUMMARY OF THE EVIDENCE

On April 6, 2011, the Court held an evidentiary hearing at which the Application

and Objection were argued.  During the hearing, Mr. Copeland and the president of the Debtor,

Timothy Anders, testified.

According to Mr. Copeland's testimony, in December 2010, Larry Sturgill called

him with questions about his guarantee of some of the Debtor's debt.  The secured creditor,

BB&T, asserted that Mr. Sturgill guaranteed $1,000,000 of the debt, but Mr. Sturgill believed

that he only guaranteed a debt of about $380,000 secured by one piece of equipment.  That

equipment had already been returned to the dealer so that it could be sold, and Mr. Copeland's

representation of Mr. Sturgill was for the purpose of negotiating with BB&T to prevent suit

against Mr. Sturgill by agreeing to pay about $12,000 to refurbish the equipment and thereby

facilitate the sale.

Mr. Copeland testified that in January 2011, Mr. Sturgill told him that he would

like Mr. Copeland to represent the Debtor, and they arranged a meeting with the Debtor's

president, Mr. Anders.  Concerned about the potential disqualification issue, Mr. Copeland

called a trial attorney with the Office of the United States Trustee and left a voice mail message.

He then e-mailed the trial attorney on February 22 to explain that he had terminated his

representation with Mr. Sturgill, who had obtained new counsel, and ask for her thoughts about

his representation of the Debtor.  She responded with certain questions, which Mr. Copeland

8

answered.  Mr. Copeland then received a $25,000 retainer from the Debtor and placed it in the

Firm's trust account.  The Debtor paid a portion of this retainer by endorsing checks from Wells

Fargo Insurance Services, New River Hardwoods, Inc., and Range Resources Corporation over

to the Firm, and Mr. Copeland testified on cross-examination that these were received on March

17.  The balance was paid with a cashier's check, which was received by the Firm at around 10

a.m. on March 18.  He estimated his time spent working for the Debtor pre-petition to be worth

$3,000 and directed his bookkeeper to write a check for that amount from the Firm's trust

account to its operating account at about 9 a.m. on March 18.  He also took $1,039 from the trust

account and applied it to his partner's credit card to pay the filing fee.[5]  He testified that he then

filed the petition, which the Court's records indicate was received at 11:14 a.m. on March 18.

Nothing in Mr. Copeland's testimony indicated when the checks from the trust account were

deposited into the Firm's operating account, and he admitted on cross-examination that he did

not know if the $3,000 check cleared before he filed the petition.  He also stated that he believed

the third party checks from Wells Fargo Insurance Services and New River Hardwoods, Inc.,

probably cleared before the petition was filed but that the check from Range Resources

Corporation probably did not.

Mr. Copeland further testified that he later received the Objection.  He saw that

one area of concern for the United States Trustee was the Original Agreement, so he called Mr.

---

[5] It should be noted that nothing in the Application or the Declaration disclosed anything about these pre-petition disbursements from the retainer held in the Firm's trust account. However, the Firm's Rule 2016(b) Disclosure, which was filed on April 15, 2011, indicates that counsel billed and received $3,000 prior to filing the petition and that the $25,000 retainer includes the filing fee of $1,039.  This Disclosure, which under the Rule is the independent obligation of the attorney, not that of the client debtor, was not filed until nine days after the hearing upon the contested employment application.

Anders and informed him of the problems.  He then drafted the Amended Agreement to delete the challenged provisions.  He testified that the Original Agreement was assembled from various form agreements and that he had used the agreement in a number of prior cases.[6]  He admitted that each of the challenged provisions was improper.  However, he testified that he had never in his career settled a matter without specific client approval.  He also acknowledged that receiving a non-refundable retainer as pre-payment for work to be performed was unethical under the Virginia Rules of Professional Conduct, but further represented that he had always considered his compensation in bankruptcy cases to be subject to the approval of the bankruptcy court.

The Court questioned Mr. Copeland about section six of the Original Agreement, which was not challenged by the United States Trustee and which was left unchanged in the Amended Agreement.  That provision provides:

> Client may terminate the Firm's services at anytime upon 15 days' written notice to that effect, but Client will remain liable for all attorney's fees and expenses as provided herein through the effective date subject to the approval of the Court, the Firm may terminate its services upon like notice if the Client fails to cooperate with the Firm or if the Firm determines, in its reasonable discretion, that continuance of its services would be impractical, unethical, or ineffective.

---

[6] After reviewing the most recent Chapter 11 cases filed by the Firm in this Court, the Court notes that a similar agreement was used in the case of *In re Vencill*, No. 10-72956.  In the following cases, no agreement was ever filed:  *In re Lee County Childcare Council*, No. 11-70168; *In re Clinch Mtn. Finishing & Logistics*, No. 10-72574; *In re M&M Enters., Inc.*, No. 10-70468; *In re Gomez*, No. 09-72179; *In re Mullins*, No. 09-70595; and *In re Lester*, No. 09-70048.  In the most recent case filed by the Firm, *In re Boyington*, No. 11-70729, the agreement attached to the application to employ does not contain the provisions that the United States Trustee objected to in this case.  The *Boyington* case was filed on April 1, 2011, which is the same day the United States Trustee filed the Objection in the present case.  According to the Court's Case Management/Electronic Filing System, the Objection was filed at 4:30 p.m., the petition in the *Boyington* case was filed at 4:55 p.m., and the debtor's application to employ the Firm in that case was filed at 5:29 p.m.

The Court observed that the provision giving the Firm the right to terminate the relationship did not seem to recognize that counsel in a bankruptcy case may only withdraw with court approval. Mr. Copeland stated that he was aware that he could not withdraw as counsel without court approval in bankruptcy matters and that the provision relating to withdrawal as counsel was meant to read as follows:  "Subject to the approval of the Court, the Firm may terminate its services upon like notice . . . ."  He admitted that a period was missing from the provision and stated that he took full responsibility for the sloppy drafting.

Under cross-examination by the United States Trustee, Mr. Copeland admitted that the trial attorney did not indicate in her e-mails that she thought it would be acceptable for Mr. Copeland to represent the Debtor, but he stated that he was asking for objections, she never indicated any objection, and that if she had objected, he would not have taken the representation. He stated that the representation of the Debtor began on February 25, 2011 and that the representation of Mr. Sturgill ended a week before that[7] in a joint meeting among Mr. Copeland, Mr. Anders, and Mr. Sturgill at which Mr. Sturgill indicated he would terminate the relationship so that Mr. Copeland could represent the Debtor.  He again stated that both clients consented to the representation of the Debtor.  When asked if this meant that he believed a conflict existed that required a waiver, Mr. Copeland stated that he would not apply to be counsel if a conflict existed.  He also stated that he did not believe a waiver would be enough in this case if his representation of Mr. Sturgill had continued and that the representation of Mr. Sturgill had to be

---

[7] In the Declaration, however, Mr. Copeland stated that the Firm represented the Debtor since February 28, 2011 and that the representation of Mr. Sturgill "ended on approximately February 25, 2011."

terminated.

When asked what the Debtor intends to do with the collateral for the loans Mr. Sturgill guaranteed, Mr. Copeland indicated that the only loan he was aware of at the time was that secured by the collateral that had been returned and will be sold. He indicated that if the collateral is properly marketed, there may be no deficiency claim, so Mr. Sturgill may not be impacted at all. He indicated that he has since learned that Mr. Sturgill guaranteed other loans and that a limited liability company owned by Mr. Sturgill leases a truck to the Debtor. He admitted that he did not file a supplemental disclosure about this discovery, but he stated that he felt such supplemental disclosure was unnecessary because it did not relate to his representation, which was finite and had been terminated.

When asked about the lease of the truck, Mr. Copeland stated that he had never seen the document and stated that at the time Mr. Sturgill consented to the representation of the Debtor, he did not discuss how the Debtor could treat the lease under 11 U.S.C. § 365 because his representation did not relate to it. He also stated that he would represent the Debtor with regard to the lease if it became an issue in the bankruptcy case and would do what he would do in any other case with similar issues.

Mr. Anders was then called to the stand. He testified that Mr. Sturgill told him about Mr. Copeland's assistance with his guaranty and said that if the Debtor ultimately ended up filing for bankruptcy, Mr. Copeland would be the best attorney to represent it. Mr. Anders indicated that he believed Mr. Sturgill had no ulterior motive in recommending Mr. Copeland. He testified that Mr. Sturgill knew of the Debtor's financial situation and recommended Mr. Copeland because he believed him to be the best attorney for Chapter 11 cases. He stated that he

12

was at the meeting where Mr. Sturgill asked Mr. Copeland to terminate the latter's representation

of him and to represent the Debtor instead because its financial situation was much worse.  On

cross-examination, Mr. Anders denied that he filed under Chapter 11 to protect Mr. Sturgill in

any way.  He stated that he thought reorganization would be in everyone's best interest and that

is why he retained Mr. Copeland.  He also stated that he believed that the collateral securing the

loans that Mr. Sturgill had guaranteed had sufficient equity to prevent any claim being brought

against Mr. Sturgill in any event.

### FINDINGS OF FACT

From the evidence before the Court, it makes the following findings of fact

pertinent to the matters in dispute:

1. The Debtor filed this case in this Court under the provisions of Chapter 11 of the

Bankruptcy Code on March 18, 2011 and on the same day filed its application to employ the

firm of Copeland & Bieger, P.C. (the "Firm") to represent it in the conduct of the case.

2.  The Firm's engagement partner for this case is Robert T. Copeland, who has

specialized in representing bankruptcy debtors in this Court for over thirty years.  He is a highly

capable attorney with considerable experience in Chapter 11 reorganization cases and is clearly

competent to handle a significant and complicated case of the type involved here, which involves

over five million dollars of secured debt and over one million dollars of unsecured debt.

3.  The management of the Debtor has great confidence in Mr. Copeland and his ability

to represent it in this case and continues to support the Application to employ the Firm.

4.  Mr. Copeland has acted in good faith in his decision to accept representation of the

Debtor in this case, the preparation of his Declaration in support of the Application to employ

13

the Firm, and his disclosures of his pre-filing representation of Mr. Larry Sturgill, CPA with

respect to the latter's guaranty of some of the Debtor's secured indebtedness to one of its

lenders.

5.   The schedules and Statement of Financial Affairs filed in this case under Mr.

Copeland's supervision are significantly and materially deficient and do not comply with the

applicable instructions for the Official Form for the filing of a bankruptcy case. For example,

Schedule D (Creditors Holding Secured Claims) requires that the following information be

provided for each claim listed:  "Date claim was incurred, nature of lien, and description and

value of property subject to lien."  For each of the thirty-three (33) claims listed, the information

provided is the following:  "Security Agreement Value $0.00."  Schedule E (Creditors Holding

Unsecured Priority Claims) requires that the following information be provided for each

individual claim:  "Date claim was incurred and consideration for claim."  Five claims are listed

but no information, other than their scheduled amounts, is provided for any of them. Schedule F

(Creditors Holding Unsecured Nonpriority Claims) requires that the following information be

provided for each individual claim:  "Date claim was incurred and consideration for claim. If

Claim is subject to setoff, so state."  No such information is provided for any of the claims listed

on Schedule F's eighteen pages.  The Statement of Financial Affairs requires, among many other

things, a disclosure of any amounts paid by the Debtor for debt-related legal services and the

date or dates such payments were made.  The Statement filed with the Court fails to list the date

or dates in question when disclosed amounts were paid to the Firm although such information

was well known to the Firm and such Statement was not filed until almost a month after the date

the case was filed.  The foregoing examples represent some of the most glaring omissions and is

14

not intended to be exhaustive.

6. This Court's Local Rule 5005-4 provides in section E thereof that

> payment of any fees applicable to the use of the court's electronic
> filing system . . . shall be paid in such manner as may be provided for
> in the Administrative Procedures authorized by the "Order Adopting
> Case Management/Electronic Case Filing" in . . . [this Court], as the
> same may be amended from time to time and posted on this Court's
> Internet website.

The most recent version of that order, dated May 2, 2005, which is posted on this Court's

website, requires that all petitions and other pleadings, with certain limited exceptions, in cases

which are filed by attorneys must be filed electronically and that filing fees must be paid by

credit card:  "For filings that require a fee, registered participants shall pay such fees

electronically via the internet by means of the on-line credit card payment system required by the

Court. All payments are to be made contemporaneously with the filing."

7.  The Court further finds those facts which were not the subject of any dispute which

are referenced in the foregoing sections of this decision and those which are referenced in the

subsequent portions of this decision as furnishing a factual foundation for the ruling announced

herein.

## CONCLUSIONS OF LAW

This Court has jurisdiction of this proceeding by virtue of the provisions of 28

U.S.C. §§ 1334(a) and 157(a) and the delegation made to this Court by Order from the District

Court on July 24, 1984.  An application by a Chapter 11 debtor-in-possession to employ counsel

is a "core" bankruptcy matter pursuant to 28 U.S.C. § 157(b)(2)(A).

This Court has previously dealt with the subject of contested applications for the

appointment of corporate debtors' counsel in Chapter 11 reorganization cases in the case of *In re*

15

*Coal River Res., Inc.*, No. 04-00988 (Bankr. W.D. Va. July 2, 2004), *aff'd*, 321 B.R. 184 (W.D.

Va. 2005).  While that case involved issues of multiple interrelated corporate debtors with

substantial claims of inter-corporate debt which presented different issues than are presented in

the present dispute, it did involve some of the same statutory provisions and general principles

which are relevant to the matter now before the Court.  Accordingly, this decision will repeat

some of the observations noted and conclusions of law reached in that decision.

### COUNSEL MUST BE "DISINTERESTED" AND HOLD NO INTEREST ADVERSE TO ESTATE

The statutory provisions governing employment of attorneys and other

professional persons by a bankruptcy trustee are contained in 11 U.S.C. § 327.  Subsection (a)

provides in part as follows:

> Except as otherwise provided in this section, the trustee, with the court's approval, may employ one or more attorneys . . . that do not hold or represent an interest adverse to the estate, and that are disinterested persons, to represent or assist the trustee in carrying out the trustee's duties under this title.

Subsection (c) provides:

> In a case under chapter 7, 12, or 11 of this title, a person is not disqualified for employment under this section solely because of such person's employment by or representation of a creditor, unless there is objection by another creditor or the United States trustee, in which case the court shall disapprove such employment if there is an actual conflict of interest.

As pertinent to the subject of employment of counsel, a Chapter 11 debtor-in-possession has the

same rights, powers and duties as a trustee.  11 U.S.C. §1107(a).  Section 329(a) of the

Bankruptcy Code obliges legal counsel to a bankruptcy debtor to disclose "the compensation

paid or agreed to be paid" for such counsel's services and "the source of such compensation."

16

Bankruptcy Rule 2014(a) requires that an application for employment of counsel:

> state the specific facts showing the necessity for the employment, the name of the person to be employed, the reasons for the selection, the professional services to be rendered, any proposed arrangement for compensation, and, to the best of the applicant's knowledge, all of the person's connections with the debtor, creditors, any other party in interest, their respective attorneys and accountants, the United States trustee, or any person employed in the Office of the United States trustee.

The phrase "interest adverse to the estate" contained in section 327(a) is not defined in the Bankruptcy Code itself, but a number of bankruptcy courts have approved the following definition:

> Undefined by the Bankruptcy Code, an "adverse interest" has come to mean either (1) the possession or assertion of any economic interest that would tend to lessen the value of the bankruptcy estate or create an actual or potential dispute with the estate as a rival claimant, or (2) a predisposition of bias against the estate.

*In re Granite Partners*, *LP,* 219 B.R. 22, 33 (Bankr. S.D.N.Y. 1998); *accord In re Mercury*, 280 B.R. 35, 55 (Bankr. S.D.N.Y. 2002); *In re Keller Fin. Servs. of Fla., Inc.*, 243 B.R. 806, 812 (Bankr. M.D. Fla. 1999); *In re C&C Demo, Inc.*, 273 B.R. 502, 505 (Bankr. E.D. Tex. 2001).

*See generally* 3 *Collier on Bankruptcy* ¶ 327.04[2][b] at p. 327-34 (Alan N. Resnick & Henry J. Sommer eds., 16th ed. 2011).  While the term "interest adverse to the estate" is not defined in the Code, the term "disinterested person" is defined at 11 U.S.C. § 101(14) as a person that:

> (A) is not a creditor, an equity security holder, or an insider;
> (B) is not and was not, within 2 years before the date of the filing of the petition, a director, officer, or employee of the debtor; and
> (C) does not have an interest materially adverse to the interest of the estate or of any class of creditors or equity security holders, by reason of any direct or indirect relationship to, connection with, or interest in, the debtor, or for any other reason.

17

It is apparent by reason of the language of subsection (c) of section 327 noted previously that "representation" of a creditor is not a *per se* disqualification from representing the trustee or debtor-in-possession because the Court, if an objection to such employment is filed by another creditor or the United States Trustee, shall "disapprove such employment if there is an actual conflict of interest."  The implicit corollary to this mandate is that the Court may approve such employment if it finds that no actual conflict of interest does exist.  An example of such a situation might be an attorney who has represented a creditor in a pre-bankruptcy challenge to a debtor's alleged fraudulent transfer of property who is then employed by the bankruptcy trustee to pursue the same property on behalf of all creditors.  The interest of the one creditor is the same as that of all the creditors–to recover the property for the benefit of the bankruptcy estate.  Another might be an attorney who has represented a creditor in a distinct and unrelated transaction, such as a real estate sale or purchase, having nothing to do with the creditor's claim against the bankruptcy estate.

It has been common in this Court, upon the United States Trustee's objection, to refuse to approve a debtor-in-possession's employment of a professional person who has a claim for unpaid pre-petition services or other creditor claim against the debtor unless the professional person agrees to waive such claim.  This is because, by definition, one cannot contemporaneously hold a claim against the bankruptcy estate, which makes him a creditor of that estate, and remain a "disinterested person."  11 U.S.C. § 101(14)(A).  The role of counsel for the general conduct of a bankruptcy case on behalf of a debtor-in-possession encompasses both the assertion of all claims to which the debtor is entitled, and the careful review of and, where appropriate, objection to all claims asserted against it.  The Code requires that an attorney

18

employed by a debtor-in-possession to represent it generally in the conduct of the case must be able to give it wholly undiluted loyalty.  It is this Court's responsibility to apply and enforce the statutory language provided by Congress unless it would produce an "absurd" result or "an outcome that is demonstrably at odds with the clearly expressed congressional intent."  *RCI Tech. Corp. v. Sunterra Corp. (In re Sunterra Corp.)*, 361 F.3d 257, 265 (4th Cir. 2004); *Lamie v. U.S. Tr.*, 540 U.S. 526, 534 (2004) ("It is well established that 'when the statute's language is plain, the sole function of the courts–at least where the disposition required by the text is not absurd–is to enforce it according to its terms.'" (quoting *Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1, 6 (2000))).

### COUNSEL MUST DISCLOSE ALL "CONNECTIONS"

This Court has also had prior occasion to review the obligations of counsel seeking to be approved as counsel for Chapter 11 debtors to make full disclosure of all "connections" which they have which might affect their suitability for employment under the principles already reviewed above.  In the case of *In re Five Forty Park Corp.*, No. 03-04746 (Bankr. W.D. Va. Sept. 30, 2004), the Court prospectively, but not retroactively, sustained  a motion to disqualify counsel for a Chapter 11 debtor due to material omissions in the disclosure of counsel's prior "connections" with various material parties in interest in the case even though the Court did not affirmatively find that such omissions constituted a willful attempt to mislead the Court or the United States Trustee.  The Court will also repeat (and in some instances somewhat revise) some of the discussion contained in that decision concerning counsel's disclosure obligations:

19

Section 327 of the Bankruptcy Code is implemented by Bankruptcy Rule 2014, which obliges the trustee or debtor-in-possession to include in an application for employment of a professional person, "to the best of the applicant's knowledge, all of the person's connections with the debtor, creditors, [and] any other party in interest," and similarly requires the professional person to make "a verified statement . . . setting forth the person's connections with the debtor, creditors, [and] any other party in interest." This disclosure "must be explicit enough for the court and other parties to gauge whether the person to be employed is not disinterested or holds an adverse interest." *In re Midway Indus. Contractors, Inc.*, 272 B.R. 651, 662 (Bankr. N.D. Ill. 2001). Published bankruptcy court decisions are quite consistent in requiring that debtors-in-possession and their attorneys, whose employment is sought to be approved, be meticulous in disclosing "all connections" with the debtor and other parties in interest, the failure to do so justifying a court's taking significant punitive or corrective action. If no actual conflict of interest is presented and the Court is satisfied that there was no intent to conceal on counsel's part, disqualification of counsel and/or denial of all compensation is not mandated and the proper remedy is left to the Court's broad discretion. *See In re Northwestern Corp.*, No. 03-12872 (CGC), 43 Bankr. Ct. Dec. 93, 2004 Bankr. LEXIS 1023, at *6, 2004 WL 1661016, at *2 (Bankr. D. Del. July 23, 2004) (disqualification denied because disclosures made early in case to United States Trustee indicated no intent to conceal); *Midway Indus. Contractors*, 272 B.R. at 663-65. Nevertheless, because "[t]he objective of requiring disclosure is not so much to protect against prejudice to the estate, but to ensure undivided loyalty and untainted advice from professionals[,] . . . lack of disclosure in and of itself is sufficient to warrant disqualification, even if in the end there was no prejudice." *Id.* at 664 (citation omitted); s*ee also In re Rabex*

20

*Amuru of N.C., Inc.*, 198 B.R. 892, 897 (Bankr. M.D.N.C. 1996) (attorneys for debtor removed because of appearance of impropriety, even though no harm done to debtor).

In addition to the extensive duty imposed by § 327 and Bankruptcy Rule 2014(a) upon counsel seeking to be employed by a bankruptcy trustee or debtor-in-possession to disclose all "connections" with the debtor and other parties in interest, § 329 requires "[a]ny attorney representing a debtor in a case under this title" to file with the Court and the United States Trustee a "statement of the compensation paid or agreed to be paid . . . for services rendered or to be rendered in contemplation of or in connection with the case by such attorney, and the source of such compensation." 11 U.S.C. § 329(a). This requirement is implemented by Bankruptcy Rule 2016(b) which requires the attorney for the debtor to file and transmit to the United States Trustee the statement required by § 329 within 14 days of the order for relief. It has been noted that an attorney's disclosure obligations under § 329 and Rule 2016(b) are "central to the integrity of the bankruptcy process" and should not be taken lightly. *In re TJN, Inc.*, 194 B.R. 400, 403 (Bankr. D.S.C. 1996).[8]

## ATTORNEY FEE RETAINERS IN BANKRUPTCY CASES

Payment of retainers to bankruptcy counsel to persuade them to take on complex reorganization cases for cash-strapped debtors is common practice. Indeed, without some degree of reasonable assurance that counsel will be compensated, if not entirely at least substantially,

---

[8] See also *In re Hooper*, No. 93-11599-AB, 2001 WL 34054526, at *10 (Bankr. E.D. Va. Oct. 29, 2001) and cases there cited, including *Keller Fin. Serv. of Fla., Inc.*, 248 B.R. 859, 886-87 (Bankr. M.D. Fla. 2000) (disgorgement required of entire $1,305,419 retainer for failure to make complete disclosure in violation of § 329 and Rule 2016) and *In re Redding*, 263 B.R. 874 (B.A.P. 8th Cir. 2001) (disgorgement of all but $1,000 of $11,011.40 received by experienced attorney based on failure to disclose amount and source of retainer).

for their services, it is difficult to see how the bankruptcy system could function.  If counsel fail

to exercise some vigilance towards their own financial protection in cases of this kind, it is

unlikely that anyone else will see to it for their benefit.  The United States Court of Appeals for

the Fourth Circuit has addressed within the last decade in a case arising from this very District

the different types of attorney retainers, *U.S. Tr. v. Equip. Servs., Inc. (In re Equip. Servs., Inc.)*,

290 F.3d 739 (4th Cir. 2002).  It noted as follows:

> Retainer agreements can take various forms.  For example, a retainer
> can be paid simply to ensure an attorney's availability to represent
> the client, whether or not services are ever performed.  Or a retainer
> can be a prepayment for all future services to be performed,
> amounting to a flat fee.  Under either one of these arrangements, the
> attorney acquires title to the retainer fee at the time he receives it,
> regardless of whether he thereafter performs legal services for the
> client.  *See Indian Motorcycle Assocs. v. Mass. Housing Finance*, 66
> F.3d 1246, 1254 (1st Cir. 1995).  On the other hand, if the
> relationship is a trust arrangement in which the attorney holds the
> retainer for the client as security for the payment of future fees, then
> the retainer so held, less any fees charged against it, constitutes the
> property of the client.  *See Indian Motorcycle*, 66 F.3d at 1255; *see
> also* 11 U.S.C. § 541(a).

290 F.3d 739, 746 (4th Cir. 2002).  It ought to be noted that the Court's discussion does not

address the issue of whether a "flat fee retainer" which would become the property of an attorney

prior to his or her rendition of the contracted for legal services is ethically permissible under

Virginia's current Rules of Professional Conduct, Part 6 of the Rules of the Supreme Court of

Virginia.  *See* Rules 1.15(a)(2)[9] and 1.16(d).[10]  The very challenging bankruptcy law, state

---

[9]

> (a) All funds received or held by a lawyer or law firm on behalf of a
> client, other than reimbursement of advances for costs and expenses,
> shall be deposited in one or more identifiable escrow accounts
> maintained at a financial institution in the state in which the law
> office is situated and no funds belonging to the lawyer or law firm
> shall be deposited therein except as follows:

22

property law, professional responsibility, and practical business issues posed by the use of

retainers to assure compensation for bankruptcy debtors' counsel has long been a matter of

considerable academic interest to the judge of this case.  *See generally* William F. Stone, Jr. &

Bryan A. Stark, *The Treatment of Attorneys' Fee Retainers in Chapter 7 Bankruptcy and the*

*Problem of Denying Compensation to Debtors' Attorneys for Post-Petition Legal Services They*

*Are Obliged to Render*, 82 Am. Bankr. L.J. 551 (2008), for a discussion of these issues with

respect to Chapter 7 cases.

### COUNSEL MUST COMPLY WITH APPLICABLE ETHICAL OBLIGATIONS

Lastly, the authority of bankruptcy courts to require adherence to the applicable

ethical obligations of the attorneys practicing before them is well established.  As this Court

noted in a joint decision signed by all three of its judges:

> Bankruptcy courts are statutorily designated as "a unit" of the federal district courts and bankruptcy judges are declared to be "judicial officer[s]" of the district court by 28 U.S.C. § 151, which provides as follows:
>
> > In each judicial district, the bankruptcy judges in regular active service shall constitute a unit of the district court to be known as the bankruptcy court for

---

. . . .

> > (2) funds belonging in part to a client and in part presently or potentially to the lawyer or law firm must be deposited therein, and the portion belonging to the lawyer or law firm must be withdrawn promptly after it is due unless the right of the lawyer or law firm to receive it is disputed by the client, in which event the disputed portion shall not be withdrawn until the dispute is finally resolved.

[10] "Upon termination of representation, a lawyer shall take steps to the extent reasonably practicable to protect a client's interests, such as . . . refunding any advance payment of fee that has not been earned . . . ."

that district.  Each bankruptcy judge, as a judicial officer of the district court, may exercise the authority conferred under this chapter with respect to any action, suit, or proceeding and may preside alone and hold a regular or special session of the court, except as otherwise provided by law or by rule or order of the district court.

It is part of the inherent authority of bankruptcy judges as judicial officers of the United States District Courts to regulate the practice of attorneys permitted to practice before them.  *See* 11 U.S.C. § 105(a) and 2 *Collier on Bankruptcy* ¶ 105.04[7][b] at p. 84.4 - 84.6 (Alan N. Resnick & Henry J. Sommer eds., 15th ed. rev. 2005). *McGahren v. First Citizens Bank and Trust Co. (In re Weiss)*, 111 F.3d 1159, 1171 (4th Cir. 1997), *cert. denied*, 522 U.S. 950, 118 S. Ct. 369 (1997)  ("A federal court also possesses the inherent power to regulate litigants' behavior and to sanction a litigant for bad-faith conduct.", citing and quoting from *In re Heck's Properties, Inc.*, 151 B.R. 739, 765 (S.D.W.Va. 1992) ("It is well-recognized, . . . quite apart from Rule 9011, that courts have the inherent authority to impose sanctions upon counsel who is found to have acted in bad faith, vexatiously, wantonly or for oppressive reasons."))

*In re Bowman,* Misc. Proc. No. 07-00701, slip op. at 12-13 (Bankr. W.D. Va. March 31, 2008), *aff'd*, No. 7:08CV00339, 2010 U.S. Dist. LEXIS 62004, 2010 WL 2521441 (W.D. Va. June 21, 2010).

With these general principles in mind, the Court will address the specific issues presented by the contentions of the United States Trustee and the explanations and argument offered by the Firm.

### OBJECTIONABLE PROVISIONS OF EMPLOYMENT AGREEMENT

Mr. Copeland conceded immediately the validity of the points raised by the United States Trustee with respect to the Original Agreement entered into by the Firm and the Debtor and drafted the Amended Agreement removing the criticized provisions.  He initially contended in his written response to the Objection that this remedial action rendered these points

24

"no longer operative."  The Court, however, agrees with counsel for the United States Trustee

that such action does not negate the issue of the propriety of the inclusion of these provisions in

the original agreement in the first place.  In his testimony before the Court at the hearing, Mr.

Copeland acknowledged immediately that language in the agreement authorizing the Firm to

settle matters without the client's approval having been obtained and purporting to make the

$25,000 retainer non-refundable were improper and should never have been in the Original

Agreement.  He was certainly correct in that assessment.  He also admitted that the provision that

could be read as permitting the Firm to terminate its services without leave of the Bankruptcy

Court to do so was poorly drafted.  While he forthrightly accepted personal responsibility for

these errant provisions, as indeed he certainly already bore, he was at a loss to explain how they

came to be there in the first place other than they may have come from some form attorney

employment agreements.  Indeed it does seem almost inexplicable that an attorney having such

long and very considerable experience in representing Chapter 11 bankruptcy debtors as Mr.

Copeland possesses could be so casual about an employment agreement for a case on behalf of a

debtor having, according to its filed schedules, more than six million dollars in debt.

The Court is most troubled by the provisions of the agreement purporting to make

the $25,000 retainer non-refundable and authorizing the Firm to make settlements without client

approval.  Mr. Copeland testified that in thirty-five years of law practice he had never settled a

matter without client authorization.  The Court accepts that representation as accurate, but notes

that it makes more baffling the question why such language ever made it into the Firm's

agreement.  The Court agrees with counsel for the United States Trustee that these provisions on

their face created an interest in the Firm's favor which was adverse to the bankruptcy estate.  *See*

25

*In re Craig*, 265 B.R. 624, 628 (Bankr. M.D. Fla. 2001) (provision in pre-petition employment agreement which gave to Chapter 11 debtor's attorneys the authority to move to dismiss or convert the case if client became delinquent in payment of attorneys' fees created an interest potentially adverse to the debtor and precluded approval of application to employ firm).   The reasons for that conclusion are that (1) the settlement authority put the Firm, rather than the Debtor, in control of the case and its natural effect would be to inhibit the Debtor in the exercise of its own responsibilities as debtor-in-possession, and (2) the non-refundable language would inhibit the Debtor from ever exercising its authority to terminate the Firm's services at any point prior to the latter performing the services necessary to earn the retainer (less the $1039 filing fee) in full.   Similarly, the provision[11] permitting the Firm to terminate its services without obtaining leave of court to do so,[12] as is obligatory under this Court's Local Rule 2091-1, would tend to make the client leery of challenging the Firm's advice or its actions in the case for fear of suddenly being left without counsel in its efforts to reorganize.   In short, even if these provisions

---

[11]   The language of this section was quoted previously in this decision.   In addition to the problem with that portion of this section purporting to give the Firm the right to terminate its representation without leave of court, the provision requiring the client to give two weeks notice of any decision on its part to terminate the Firm's representation also appears to be problematic. Virginia Rule of Professional Conduct 1.16(a)(3) provides that "a lawyer shall not represent a client or, where representation has commenced, shall withdraw from the representation of the client if . . . the lawyer is discharged."   Section [4] of the Comment to this Rule states flatly that "[a] client has a right to discharge a lawyer **at any time**, with or without cause." (emphasis added)

[12]   This issue was one raised by the Court sua sponte as it was not objected to by the United States Trustee.   The Court, however, has its own independent responsibility with regard to the approval of counsel to represent the chapter 11 debtor-in-possession.   *See* 11 U.S.C. § 327(a); *cf. United Student Aid Funds, Inc. v. Espinosa*, 130 S. Ct. 1367, 1381 (2010) (stating that, under 11 U.S.C. § 1325(a), bankruptcy courts have an obligation to direct a Chapter 13 debtor to conform his plan to the requirements of the Code regardless of whether a creditor or other party objects to confirmation of the plan).

were never actually sought to be enforced by the Firm, just their presence in the agreement

would serve to inhibit the client's exercise of its rights which were inconsistent with these

provisions.  If the Court were of the opinion that the Firm included these provisions in the

Agreement with such purposes in mind, it would not hesitate to disqualify the latter from serving

as Debtor's counsel in this case.  However, the Court is not of that opinion. Therefore, while the

Court concludes that the inclusion of such provisions in the retainer agreement in question to be

of such seriousness as to justify some sanction designed to dissuade counsel from utilizing such

provisions in the future, under the facts presented in this case it does not believe that

disqualification from serving as bankruptcy counsel for the Debtor is warranted, provided that

counsel complies with the conditions set forth hereafter in this decision.

### PRIOR REPRESENTATION OF LARRY STURGILL, CPA

The pertinent ethical rules applicable to Virginia attorneys concerning possible

conflicting responsibilities to a former client and a current client are Rules 1.7, 1.8(b), and 1.9(a)

and (c) of the Virginia Rules of Professional Conduct, which are found in Part 6 of the Rules of

the Supreme Court of Virginia.  They provide as follows:

Rule 1.7.  Conflict of Interest: General Rule

(a)  Except as provided in paragraph (b), a lawyer shall not represent
a client if the representation involves a concurrent conflict of interest.
A concurrent conflict of interest exists if:
> (1) the representation of one client will be directly adverse to
> another client; or
> (2)  there is significant risk that the representation of one or
> more clients will be materially limited by the lawyer's
> responsibilities to another client, a former client or a third
> person or by a personal interest of the lawyer.
(b) Notwithstanding the existence of a concurrent conflict of interest
under paragraph (a), a lawyer may represent a client if each affected
client consents after consultation, and:

(1) the lawyer reasonably believes that the lawyer will be able to provide competent and diligent representation to each affected client;

(2) the representation is not prohibited by law;

(3) the representation does not involve the assertion of a claim by one client against another client represented by the lawyer in the same litigation or other proceeding before a tribunal; and

(4) the consent from the client is memorialized in writing.

Rule 1.8.  Conflict of Interest: Prohibited Transactions

. . . .

(b) A lawyer shall not use information relating to representation of a client for the advantage of the lawyer or of a third person or to the disadvantage of the client unless the client consents after consultation, except as permitted or required by Rule 1.6 or Rule 3.3.

Rule 1.9.  Conflict of Interest: Former Client

(a) A lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless both the present and former client consent after consultation.
. . . .

(c) A lawyer who has formerly represented a client in a matter or whose present or former firm has formerly represented a client in a matter shall not thereafter:

(1) use information relating to or gained in the course of the representation to the disadvantage of the former client except as Rule 1.6 or Rule 3.3 would permit or require with respect to a client, or when the information has become generally known; or

(2) reveal information relating to the representation except as Rule 1.6 or Rule 3.3 would permit or require with respect to a client.

In this case the evidence indicates that the idea for Mr. Copeland to cease

representing Mr. Sturgill and begin representing the Debtor in a Chapter 11 reorganization

proceeding originated with Mr. Sturgill, not Mr. Copeland.  Mr. Sturgill is a knowledgeable

accountant having some familiarity with reorganization cases.  Apparently Mr. Sturgill

understood without Mr. Copeland having to advise him that, if the latter took on the Debtor's

reorganization case, he would not be able to continue representing Mr. Sturgill.  According to

Mr. Anders, Mr. Sturgill considered Mr. Copeland to be the best Chapter 11 reorganization

attorney around and that the corporation would benefit from the latter's professional services.

Although Mr. Sturgill did not appear or testify as a witness at the hearing on the Application, the

evidence was to the effect that he engaged the services of Mr. John Lamie, another well regarded

attorney in Abingdon having considerable bankruptcy experience, including representation of

both creditors and debtors in reorganization cases.  It is true that Mr. Sturgill has a close

connection with the Debtor, being the corporation's outside accountant.  In addition he is a

creditor, a co-guarantor of some of its indebtedness to a bank, and the recipient of a $10,000

payment from the Debtor which occurred within ninety days of the latter's bankruptcy filing.

Perhaps even more significant as a practical matter as it relates to Mr. Copeland's handling of

this case is the acknowledged fact that Mr. Sturgill is directly responsible for Mr. Copeland's

winding up with the Debtor's representation, a circumstance well known to the latter.  It would

be the most natural thing in the world for Mr. Copeland to have some appreciation for the role

played by Mr. Sturgill in recommending his legal services to Mr. Anders.

        All of that said, however, the evidence seems undisputed that Mr. Copeland's

representation of Mr. Sturgill was quite limited in scope, dealing only with the latter's guarantee

of some of the Debtor's secured indebtedness to one creditor and how he might best deal with

that liability.  It did not involve any appearance before any court or other tribunal.  There is no

claim by the United States Trustee or certainly any evidence to the effect that Mr. Sturgill sought

29

advice from Mr. Copeland related to the Debtor generally, or how he could be protected if the

Debtor became a party to a bankruptcy case, or what liabilities he might have vis-a-vis the

Debtor in the event of a bankruptcy filing.  There is no indication that Mr. Copeland received

any confidential information from Mr. Sturgill during his representation of him before taking on

the Debtor's representation. There is not the slightest indication that Mr. Sturgill and Mr. Anders

did not have a clear understanding of the purpose and nature of the conflict waiver which they

signed at Mr. Copeland's request or that he in any manner brought any pressure to bear to assure

their signatures to it.  It seems quite clear that Mr. Sturgill believed that it would be in the best

interests of all parties concerned for the Debtor to have the best representation possible for the

conduct of a bankruptcy reorganization case and that he considered Mr. Copeland to be the

attorney who could provide that representation.  The Court is satisfied that just because Mr.

Sturgill might become a party to some adverse action in connection with the bankruptcy case,

such as, for example, a demand that he return to the Debtor the $10,000 payment he received

from it within ninety days prior to the bankruptcy filing, is not cause to preclude Mr. Copeland

from representing the Debtor generally in this bankruptcy case.  In the event that Mr. Copeland

were to conclude that he felt that his duty of undiluted loyalty to the Debtor might be

compromised with respect to some action against Mr. Sturgill or some financial interest of the

latter which might need to be considered in connection with the handling of this case, or Mr.

Sturgill were to believe that there was a danger that some confidential information he had

provided to Mr. Copeland might be used against him, such an issue could be addressed and

properly dealt with at the time.  The Court will not disqualify Mr. Copeland from representing

the Debtor generally in this case due to some possibility that a conflict could arise which might

require some special attention during the course of the case.

## SUFFICIENCY OF DISCLOSURE OF "CONNECTIONS"

Mr. Copeland disclosed in his Declaration accompanying the Application the following regarding the "connection" with Mr. Sturgill:  "[P]roposed counsel did provide advice to Larry Sturgill of Wise Virginia regarding his guarantees of the debt of Circle T Pipeline, Inc., but Mr. Sturgill has never been an officer director or shareholder of the Debtor.  Services to Mr. Sturgill ended on approximately February 25, 2011."  The United States Trustee has not asserted that there were "connections" with others which should have been disclosed but were not, just that the disclosure with respect to Mr. Sturgill was inadequate.  As already noted, it is certainly evident that Mr. Sturgill had a relationship with the Debtor which was considerably more significant than that of simply creditor/debtor.  The evidence does not make clear at the time Mr. Copeland completed his Declaration in connection with the Application what he knew about Mr. Sturgill's involvement with the Debtor other than the latter's status as a co-guarantor of a secured debt, which was the particular matter he had been advising Mr. Sturgill about prior to the filing, and the two creditor claims aggregating $61,897.16 which he had against the Debtor according to Schedule F filed with its petition.  Certainly by the time he filed on April 5 his Response to the Objection to his employment he was also aware that Mr. Sturgill's company, JMATT Properties, Inc., leased various items of equipment to the Debtor which were utilized in its business operations.  The Court notes, however, that we are not dealing with whether the disclosures made would have been sufficient for Mr. Sturgill to disclose all of his connections with the Debtor if he sought to be employed as its accountant in this case, which definitely would not have been the case, but whether Mr. Copeland, who properly disclosed his

31

"connection" with Mr. Sturgill, should have made an inquiry sufficient to disclose to the Court

all of the information needed for it to assess properly the likely extent that Mr. Sturgill's

economic interests would be in play in the bankruptcy case.  The Court acknowledges that such

would have been the better practice and much more in line with the obligations of counsel to

disclose "[a]ll facts that may have any bearing on the disinterestedness of a professional" and "to

make sure that all relevant connections have been brought to light."  *In re Leslie Fay Cos.*, 175

B.R. 525, 536 (Bankr. S.D.N.Y. 1994).  Even so, it is only fair to observe that the extent of the

information provided about Mr. Sturgill may well have been shaped by the questions raised by

counsel for the United States Trustee when Mr. Copeland sought to raise this issue of his

representation of Mr. Sturgill prior to his agreeing to undertake representation of the Debtor.

Even if this additional information had been provided to the Court regarding the nature of Mr.

Sturgill's involvement with the Debtor, it does not see that it changes the Court's assessment that

under the circumstances presented here it ought not to disregard the Debtor's clearly expressed

desire to continue to be represented by Mr. Copeland.  In summary, this additional information

regarding Mr. Sturgill's economic and professional involvement with the Debtor does not cause

the Court to question counsel's ability to provide untainted devotion to the interests of his client

in this case or to suspect that counsel has intentionally abbreviated his disclosures to the Court

and the United States Trustee.  If the Court concluded that either was the case, its analysis would

be much different.

### RETAINER AND COMPENSATION PAID OR PAYABLE TO COUNSEL

It is quite common for Chapter 11 debtors' counsel to require substantial up-front

payment of substantial retainers to enlist their attorneys and the necessity for them to do so

32

seems apparent.  The prospective clients who seek to obtain their services are prepared to admit

by the filing of their petitions that they are unable to pay as they come due of all of the

obligations which they are obliged to pay.  In brief, these clients' respective ability to pay for the

services to be rendered for their benefit is in doubt.  The United States Trustee does not

challenge the practice of retainers, although taken to its literal extreme, a "security retainer,"

which is the type of retainer almost always involved in a case of the type presented here, by its

very nature constitutes a secured claim by counsel against property of the bankruptcy estate.  For

very practical reasons associated with the functioning of the bankruptcy system, the Court

suggests that a distinction must be made between a proposed professional's status as a creditor of

his client for legal services and expenses advanced or otherwise incurred in connection with the

filing and conduct of the bankruptcy case and the possession of other non-case related creditor

claims against the Debtor.[13]  Mr. Sturgill provides a ready example of the distinction the Court

suggests because he appears to have both non-professional business claims against the Debtor

and presumably claims for unpaid professional services as well.  A distinction might reasonably

be made even in the general category of charges for professional services provided between

unpaid general professional services provided to the Debtor in the ordinary course of business

for both the professional and the client prior to the filing and any services specifically provided

in connection with the preparation of the bankruptcy filing.  Unless the professional has been

paid in advance on an agreed "flat fee" basis as approved by the Court of Appeals in *Equipment*

*Services, supra,* there would seem to be no possibility of an attorney providing services to a

---

[13] *See generally In re Martin*, 817 F.2d 175, 180-83 (1st Cir. 1987); 3 *Collier on Bankruptcy* ¶ 327.04[2][a][iii][A] at p. 327-29 (Alan N. Resnick & Henry J. Sommer eds., 16th ed. 2011).

33

Chapter 11 debtor without in a very real sense becoming the client's creditor.  In summary, the

Court must be mindful of the practicalities of what is necessary for the system to function and to

assume that Congress intended that the system would be able to function.

The evidence does not permit the Court to determine whether the $3,000 fee and

the $1,039 reimbursement to the Firm for the filing fee actually were transferred by the bank

holding the attorney trust account out of such account prior to the moment the bankruptcy

petition was filed.  It admittedly would be "cleaner" and the better practice if such transfers

occurred prior to filing.  After due consideration, however, the Court concludes that it is not a

factor upon which its decision ought to turn.  The uncontradicted evidence is that checks were

written against the trust account prior to filing and clearly the Firm intended to disburse to itself

what it had already earned in the preparation of the case for filing and the obligation which it

was about to incur for the requisite fee necessary to be paid simultaneously with the filing of the

petition.  Certainly it was the Debtor's intent to put the funds constituting the retainer under the

control of the Firm.  The Court concludes that the rule governing checks which have failed to

clear the Debtor's bank account prior to the filing of a bankruptcy petition ought not to be

applied to checks written before filing on funds undoubtedly transferred by the Debtor to its

attorney in payment of fees earned pre-petition and reimbursement of expenses incurred pre-

petition or necessarily incurred in connection with the act of filing the petition.  The United

States Trustee has not cited any authority holding that checks written upon retainers must clear

the trust account prior to filing or be invalid and the Court sees no statutory, rule or policy reason

why it ought to adopt such a rule having no apparent benefit to the other parties in interest in a

bankruptcy case.  Of course if an attorney or law firm has taken no meaningful action to disburse

34

from the retainer prior to the time of filing, a different analysis may be applicable.

The Court need take little time to deal with the $116 in unbilled time provided by the Firm before filing that was not covered by the $3,000 pre-petition draw from the retainer. Such amount has never been billed to the Debtor. It appears that it was Mr. Copeland's intent to charge and be paid $3,000 for the Firm's pre-filing services. In accordance with long standing practice within this District the Firm has agreed to waive any claim for this amount. As far as this Court is concerned, that offer moots any contention that the Firm was at the time of filing a creditor of the Debtor and therefore cannot qualify as being disinterested and holding no claim adverse to the estate.

## DECISION

The United States Trustee has raised some very legitimate questions about whether the Court ought to grant the Application. The fact that the Court has decided to approve conditionally the Application should not be taken as a wholesale rejection of the criticisms made by the United States Trustee. In choosing to exercise its discretion in favor of approving the Application, the Court is guided by several general principles and assessments: (1) the Firm has not engaged in any intentionally unethical or wrongful conduct, even though it has been inexcusably inattentive to the professional issues raised by a number of the provisions of the Original Agreement and even the Amended Agreement; (2) neither has it attempted to conceal relevant facts about this matter from the Court or the United States Trustee although it has failed to exercise care and thoroughness in the disclosures it has made; (3) Mr. Copeland, the Firm's engagement partner for this case, is a capable and very experienced bankruptcy reorganization attorney who is clearly competent to represent the Debtor in this case even though he has a casual approach to the detail of the cases he handles, very far removed from any adjectives such

35

as "meticulous" or "painstaking"; (4) the Debtor's choice of its own counsel is always a weighty

factor to be considered by the Court in deciding whether to approve its choice; (5)

disqualification of the Firm would likely be prejudicial to the conduct of this case and the

Debtor's prospects for a successful reorganization; and (6) there are other sanctions available to

the Court which it believes are more likely to be effective and have fewer possibly negative

consequences to counsel and the administration of the case than the complete disqualification

sought by the United States Trustee.  Accordingly, the Court will approve the Application and

deny the Objection upon the following conditions: (1) the Firm will agree to engage qualified

ethics counsel within fourteen (14) days of this date to assist it in crafting provisions for

professional employment agreements to be utilized in the future for the representation of

bankruptcy debtors which are in accord with applicable provisions of the Virginia Rules of

Professional Conduct as well as applicable bankruptcy and non-bankruptcy law, the Federal

Rules of Bankruptcy Procedure and the Local Rules of this Court, and to advise it with respect to

any professional obligations it may have with respect to the Agreement filed in this case; (2)

within thirty (30) days of this date the Firm will enter into a second Amended Agreement with

its client which is consistent with the foregoing principles and file a copy of the same with the

Court; (3) the Firm in all future Chapter 11 cases filed in this Court shall file as a part of its

Declaration in support of the application to employ it a copy of the applicable employment

agreement with its client, and shall provide to the Office of the United States Trustee and/or the

applicable case trustee upon its, her or his request therefore a copy of the applicable employment

agreement for any bankruptcy representation of a debtor under any other chapter of the

Bankruptcy Code; (4) within thirty (30) days of this date the Firm in consultation with the

Debtor shall file amended schedules and other required statements or pleadings which provide

36

all of the material information required by the applicable instructions of the Official Form for a

bankruptcy petition; and (5) the Court will take into account in connection with its consideration

of the Firm's final application for approval of fees and reimbursement of expenses in this case

the issues addressed in this decision and will request the comments of the United States Trustee,

to which the Firm will be given an opportunity to respond, regarding the amounts to be approved

upon such application.  Within fourteen (14) days of this date the Firm shall file its statement

with the Court either accepting these conditions to the Court's approval of the Application or

requesting that the Application be withdrawn or denied, unless within such time it shall file a

notice of appeal of this decision.  An order in accordance with the provisions of this decision will

be entered contemporaneously herewith.

DECIDED this 27th day of April, 2011.


_____
UNITED STATES BANKRUPTCY JUDGE